IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| CONSECO LIFE INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 4:06cv001378 SWW |
| | * | |
| | * | |
| | * | |
| ERIC WILLIAMS, individually and in his | * | |
| capacity as executor of the Estate of | * | |
| Nikki Williams, Deceased; ELLEN | * | |
| BUCKLEY; and HAROLD WILLIAMS, | * | |
| | * | |
| Defendants. | * | |

<u>MEMORANDUM AND ORDER</u>

This action involves competing claims to insurance proceeds pursuant to a $100,000 life insurance policy issued by Conseco Life Insurance Company (Conseco) to the late Niki Williams.  The matter was scheduled for trial beginning February 2, 2009, but was continued for the following reasons: On January 30, 2009, defendants Eric Williams and Harold Williams, Niki Williams' sons and original co-beneficiaries under the insurance policy, filed a pleading entitled Pretrial Brief on Preliminary Question of Law [doc.#73] in which they stated there were preliminary questions of law to be resolved prior to trial.  Defendant Ellen Buckley, Niki Williams' sister and who replaced Eric Williams and Harold Williams as beneficiary under the insurance policy, similarly stated that there were issues of law to be resolved.  Finding that the issues of law identified by defendants were issues that must be addressed prior to trial, the Court directed that defendants file a pleading addressing these and any other related legal issues and stated that the Court would rule on the preliminary legal issues prior to resetting this matter for

trial utilizing, among other things, their stipulation of agreed facts.  The defendants responded

with cross-motions for summary judgment [doc.#'s 76, 83] to which responses have been filed.[1]

Having considered the matter, the Court denies Eric Williams' and Harold Williams' motion for

summary judgment and grants Ellen Buckley's motion for summary judgment.[2]


I.

On August 15, 1994, Niki applied for a policy of life insurance with Conseco, requesting

$100,000 in insurance and naming Eric and Harold as primary beneficiaries of the policy.  On

August 28, 1994, Conseco issued life insurance Policy Number 1090169455 (the "Policy") upon

the life of Niki, in which Eric and Harold were named beneficiaries.  Niki subsequently

developed breast cancer, a disease she would battle for some 10 years.

According to Ellen, Niki underwent treatment for her cancer from October 2005 through

March 2006.  Niki was ultimately hospitalized for a couple of weeks in March 2006 and was

discharged into Eric's care because, according to Ellen, they said she needed care 24 hours a day.

Ellen states Eric took Niki  home against her wishes "but this was his mother and I allowed him

to take her home because I was responsible for her care up until that time."  However, just prior

to being discharged to Eric's house, Niki, in a psychiatric evaluation dated March 7, 2009, stated

that upon discharge, she wanted to go live with her children rather than her sister, noting that she

---

[1] By Order dated December 1, 2008 [doc.#65], the Court granted Conseco's motion for summary judgment, finding that Conseco, with the granting of its motion for summary judgment, is a mere stakeholder and discharged from further liability in this action regarding the payment of the interpleaded proceeds, none of the defendants having pending claims in this action against Conseco.

[2] The Court will hereinafter refer to Niki Williams, Eric Williams, Harold Williams, and Ellen Buckley by their first names.  The complaint spells Niki Williams' first name as "Nikki" but subsequent pleadings and exhibits spell her name as "Niki."  The Court will utilize the latter spelling.

and her sister often disagree about what is best for her treatment and that she did not want to be controlled by her sister any longer.

Niki lived with Eric in the time period beginning in March 2006 following her discharge from the hospital until March 28, 2006. Ellen states that at about 10:00 that night, Shelton Pitre (Pitre), who was Niki's boyfriend and lived in Niki's house that Niki and Pitre had bought together, called and said there was a knock on the door and Niki was standing there "so upset" with her clothes in a garbage bag and that Eric got in his car and drove off. Pitre himself states that in March 2006, he came to the door "to find Niki upset and crying in the carport with her clothes in a garbage bag." He states Niki told him that Eric " had become irate and very angry with her because she was not going to change her will to make him beneficiary so Eric dropped her off at her house with her clothes in a garbage bag." The following day, Ellen states she spoke to Niki but that Niki was physically and emotionally drained and did not feel like talking.

According to Eric, he was taking care of Niki until his "family leave ran out." He states that because he had no funds to arrange for Niki's care, including because they were deprived of access to Niki's checkbook by Ellen and Pitre, he "had no choice but to return my mother to her home to be cared for by her boyfriend, where [Pitre] and my aunt had access to my mother's funds to pay for the help she needed." Eric states he returned Niki to her home sometime in mid to late April 2006 [sic?], after calling Pitre ahead of time, "with her belongings packed in the two duffel bags which we brought home from the hospital when mother was discharged."

Ellen states that during the time Niki was in the hospital (and, apparently, a nursing home), she basically spent the days with her and that when Niki required someone at night, they (Pitre, Ellen's daughter Sharita Smith, Eric and sometimes Harold) took turns. Ellen states that

3

upon Niki being returned to her home by Eric, she assisted in Niki's care.  Ellen states visiting

nurses would come in daily and that Niki, who had broken her hip, also had a physical and

occupational therapist to come in.

Ellen states that two weeks after she again began assisting with Niki's care at Niki's and

Pitre's home, Niki told her that she wanted to change the beneficiary on her Policy.  Ellen states

she didn't do anything because she knew that Niki was mad at the boys and she "figured they

were going to come around and she would change her mind."

Ellen states Eric and Harold "had hurt [Niki] terribly" and that Niki told her that she

wanted her to be the sole beneficiary and have the money "to do something for yourself."  Ellen

states Eric and Harold did not acknowledge Niki on Mother's Day and that she gave Niki a

surprise birthday party on May 24th and invited Eric and Harold even though she (Ellen) wasn't

talking to them but that "everybody showed up but the boys."

Eric states the only reason he didn't attend the "birthday party at my aunt's home in June

[sic?[3]] was that my aunt had purposefully invited my oldest daughter's mother to attend, in the

midst of an ongoing and very bitter custody dispute, and I did think it wise [sic] to attend with

my daughter's mother present.  I also did not want to deprive my oldest daughter of her right to

go by asking my aunt to disinvite her mother with whom she was living."[4]

Pitre states that Eric and Harold "were very neglectful to their mother and had treated her

dismissive for many years."  He states that Ellen was Niki's only sibling and that Niki told him

---

[3] Ellen states she had a mini family reunion in June – "maybe 20, 25 friends and relatives" – shortly before Niki's passing and that Eric and Harold were made aware of it but did not attend.  It is not clear if Eric is confusing the two dates.

[4] There apparently is no indication in the record as to why Harold, who Ellen states had not seen his mother since November 2005, did not attend.

"that she wanted to name Ellen Buckley as beneficiary of her life insurance policy and that under no circumstances were her sons, Eric Williams and Harold Williams, to receive any of this money."

Similarly, Robert McGruder (McGruder), who asserts he knew Niki for many years, states that Niki expressly stated to him that she was embarrassed about the way Eric and Harold had treated her for many years.  He noted that Niki told him she had tried to live with Eric following her discharge from the hospital in March 2006 but that Eric constantly badgered her to change her will and to sign over all her property to her sons.  McGruder states he always told Niki not to tell Eric and Harold that she intended to change her life insurance beneficiary for fear of them becoming angry and retaliating against her, and notes that Niki told him that Eric became irate and very angry about her not changing her will and that Eric took her in his car over to her house and dropped her off with her clothes in a garbage bag.  McGruder states that after the March 2006 incident with Eric, Niki called and told him that she had made a firm decision to change her life insurance in favor of Ellen because she knew she did not have long to live.[5]

Ellen states that every other day, Niki would ask Ellen if she had called the insurance company and that when Ellen told her no, Niki would say, "well, this is something that I want to do.  I need to do."  Ellen states that Niki "finally became so upset because I wasn't doing anything that I didn't know what was going on and I had to take her back to the hospital around the first of May."  Ellen states that she and Niki were told by the doctor that Niki was probably just having panic attacks but that the doctor also told them that the treatments were not working

---

[5] Ellen states that upon learning her condition was terminal, Niki did not want Eric and Harold to know her condition but Ellen states she nevertheless saw to it that they knew.

and called in Hospice.

Eric and Harold, however, note that the hospital records indicate that Niki's hospitalization was May 15-17, 2006, not "around the first of May." In any case, Eric and Harold acknowledge that "[i]n early May 2006, [Niki] was discharged from the University of Arkansas Medical Center and thereafter until her death lived in the home of her sister defendant Ellen Buckley." Ellen states that before Niki came home with her, Niki kept inquiring about the beneficiary issue and that she called Niki's insurance agent, Garvis Thorn (Thorn), and that Niki talked to him and told him that she wanted to change her beneficiary. Ellen states that Thorn told Niki the necessary steps that they needed to take in order to change the beneficiary.

For his part, Thorn states that he recalls having a conversation with Niki in April 2006 and that she requested that her beneficiary be changed on her Policy to her sister, Ellen. Thorn states that Niki's voice was well known to him and that she sounded alert and intelligent.

Ellen states Thorn told her the carrier for the Policy was now Conseco and she called and requested they send change of ownership forms. By Letter dated April 27, 2006, Conseco mailed to Niki a Policy Service Application with which to accomplish the change in ownership of the Policy. Upon receipt of the Policy Service Application, Ellen states that Niki looked them over and then "tried to sign the form and she just was not able to sign the form and we messed the form up." According to Ellen, "Niki had lost the ability to use her arms and she really couldn't write I guess for the last year and probably stopped paying her bills, I would guess maybe August, September. We had to write checks for her. She just – her breast cancer started out on the right and Niki's solution to pain was if you move your arm and it hurt, you just didn't move your arm. And she kind of had a frozen right shoulder. And she also had – it was some other

6

thing where her arms would really hurt and she would wear these real tight cuffs.  I can't recall what it was called.  But she just – she just couldn't write.  She couldn't – she couldn't feed herself."

Ellen states that when Niki was unable to sign (on two occasions) the Policy Service Application requesting a change in ownership, she contacted Conseco and was informed that an "X" for a signature could not be accepted and that a power of attorney would be required.   Ellen states Niki had given her permission to talk to Conseco and she told them Niki could not physically sign the form because she had no use of her right or left hand.

Ellen contacted attorney Morris Thompson (Thompson) who she new personally.  Ellen states she told Thompson that Niki could not sign her name on the Policy and that a power of attorney was needed.  Ellen states Thompson drew up the power of attorney and his secretary came to Ellen's house with the power of attorney on a Saturday morning accompanied by Dr. William L. Rutledge, M.D.  Ellen states Dr. Rutledge, who she did not know, realized that he new Niki personally as a former classmate and that he and Niki started visiting with each other and he asked Niki numerous questions to determine her competency and make sure she understood what she was doing.  Ellen states Niki said that she did understand what she was doing and that Niki explained to Dr. Rutledge what she wanted to do.  Ellen further states that Niki wanted to know if she could withdraw the power of attorney if she regained the ability to write and that Dr. Rutledge said she could.

Dr. Rutledge likewise states that when he arrived at Ellen's residence, he recognized Niki as a former high school classmate and friend from many years ago and that he and Niki had a very pleasant conversation reminiscing about mutual friends in high school.  He states he asked

Niki questions and by her responses he determined, with a reasonable degree of medical certainty, that Niki was cognitively and emotionally oriented as to time and place, alert as to the events surrounding her and her situation, and that she was fully aware of why she and he were there.  Dr. Rutledge also states he determined that Niki was unable to control her motor skills in her hands and arms with much skill, that she experienced tremors and shaking in her hands, and that it was painful for her to sign her name because of upper limb and hand weakness from a past surgical removal of the tissue and lymph glands under her arms related to her treatment for metastasized breast cancer.  He states that during the time he observed Niki, she was calm, comfortable, appeared to be well groomed, appropriately dressed and cared for, and not under any coercion, stress, fear, duress, or  mental weakness, and that he did not observe any unusual behavior in Niki or any other persons attending the execution of the power of attorney.

The power of attorney Thompson prepared for Niki's signature provides:

<u>DURABLE POWER OF ATTORNEY</u>

KNOW ALL MEN BY THESE PRESENTS:

That I, Niki C. Williams, Pulaski County, Arkansas, do hereby appoint Ellen M. Buckley, as attorney in fact for me and in my name to exercise, do or perform any act, right, power, duty, or obligation whatsoever that I now have or may acquire the legal right, power, or capacity to exercise, do or perform in connection with, arising out of, or relating to any person, item, thing, transaction, business property, real or personal, tangible or intangible, or matter whatsoever.

The rights, powers, and authority of said attorney in fact to exercise any and all of the rights and powers herein granted shall not become ineffective upon my disability or incapacity and thereafter my attorney in fact shall continue to have full right and power to designate herself or any other person in her stead as the guardian of my person.  Further, my attorney in fact shall have the right to consent to make any decisions relating to medical treatment or any other decision affecting my health and welfare.

I hereby revoke any and all Powers of Attorney heretofore executed by me.

I hereby fully ratify and confirm all that my said agent may do in said premises.

Witness my hand this 13th day of May, 2006.

/s/Niki C. Williams[6]
Niki C. Williams

The power of attorney was witnessed by Dr. Rutledge and Sherita Smith, as previously noted Ellen's daughter. Ellen does not recall that Niki ever spoke with Thompson and Ellen paid him on Niki's account by signing her name for Niki.[7] Ellen states that following the execution of the power of attorney, she did not have any further discussions with Thompson's office.

Six days after executing the power of attorney, Ellen, on May 19, 2006, executed the Policy Service Application on behalf of Niki utilizing her recently acquired power of attorney. The Policy Service Application requesting a change in ownership of the Policy was witnessed by Ronald Dedman (Dedman), the boyfriend of Ellen. Ellen notes that Niki was present as well and "saw [her] sign [the] change of ownership forms."

After Ellen mailed the Policy Service Application seeking a change in ownership of the Policy to Conseco, which was received by Conseco on May 24, 2006, she received information back from Conseco indicating that they had changed the owner of the Policy to Ellen. Upon receipt of this information, Ellen called Conseco back and requested a change of beneficiary forms. Ellen states she requested a change of ownership form and, upon receiving that, a change

---

[6] The signature on the power of attorney is illegible but there is no real dispute that it was Niki's signature.

[7] Ellen states that beginning in April 2006, prior to the execution of the power of attorney, she began signing Niki's name to checks on Niki's account, apparently to in part pay Niki's bills. Included in the record are checks to Chase in the amount of $145.01, U.B.S. in the amount of $59.83, State Farm Insurance Company in the amount of $49.85, Entergy in the amount of $52.99, Comcast Cable in the amount of $71.22, and AT&T in the amount of $75.77.

of beneficiary form because that is the sequence suggested by Thorn to herself and Niki.

Upon receipt of the change of beneficiary forms, Ellen, on June 5, 2006, changed the beneficiary to herself on the Policy and had the document witnessed by Dedman. The change in beneficiary form as executed by Ellen was received by Conseco on June 7, 2006, which then changed the named beneficiaries of the Policy from Eric and Harold to Ellen. Conseco acknowledged in writing that both the ownership and beneficiary changes were accepted by Conseco.

On June 18, 2006, Niki died while the Policy was in full force and effect. She was 55 years of age at the time of her death, as previously noted having battled breast cancer for some 10 years.

On July 17, 2006, Conseco received a claim from Ellen for the proceeds of the Policy. Conseco also received a written demand from Eric and Harold not to pay Ellen the Policy proceeds.

By letter dated August 8, 2006, Conseco informed Ellen that the current beneficiary of record on the Policy was not valid under Arkansas law, citing Ark. Code Ann. § 28-68-410, which provides in pertinent part as follows:

> In a statutory power of attorney, the language granting power with respect to insurance and annuity transactions empowers the agent to:
>
> > (4) designate the beneficiary of the contract, but an agent may be named a beneficiary of the contract, or an extension, renewal, or substitute for it, only to the extent the agent was named as a beneficiary under a contract procured by the principal before executing the power of attorney;
>
> · · ·

(10) change the beneficiary of a contract of insurance or annuity,
but the agent may not be designated a beneficiary except to the
extent permitted by paragraph (4).

Conseco subsequently filed this interpleader action requesting a determination from this

Court as to how the Policy proceeds should be distributed.


## II.

Eric and Harold move for summary judgment on grounds that there is no language in the

power of attorney indicating that Niki intended, or even knew, that Ellen would acquire for

herself Niki's $100,000 insurance proceeds and that absent express intention, an agent may not

utilize her position for her or a third party's personal benefit in a substantially gratuitous transfer.

Ellen, in turn, moves for summary judgment on grounds that she changed herself to owner of

Niki's Policy pursuant to the authorized power of attorney and upon the express authority of Niki

and that once she obtained ownership of the Policy, her causing herself to become beneficiary of

the Policy was not an action taken as an agent of Niki but one in her capacity as owner of the

Policy.  Both parties argue there are no genuine issues of material fact remaining for trial and that

each is entitled to summary judgment as a matter of law.[8]


## A.

Summary judgment is appropriate when "the pleadings, depositions, answers to

---

[8] By Order dated September 5, 2007 [doc.#40], the Court denied a motion for summary judgment filed by Eric and Harold on grounds that the state of the record as it then existed was not sufficiently developed to warrant summary judgment. Since then, the record has been further developed and the parties now agree that this action may be resolved on summary judgment.  *See* Def. Buckley's Br. in Supp. of Mot. for Summ. J. at 15-16 [doc.#84]; Cross-Defendant Buckley's Br. in Supp. of Resp. to Cross-Claimants Eric Williams' and Harold Williams' Mot. for Summ. J. at 1-2 [doc.#88]; Br. in Supp. of Def.s Eric Williams' and Harold Williams' Mot. for Summ. J. at 10-14 [doc.#77].

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## B.

Ordinarily, the party challenging the validity of an instrument is required to prove by a preponderance of the evidence that the grantor lacked mental capacity or was unduly influenced at the time the instrument was executed. *Looney v. Estate of Wade*, 310 Ark. 708, 710, 839

S.W.2d 531, 533 (1992).  But where a beneficiary procures the making of the instrument and

benefits from that procurement, a rebuttable presumption of undue influence arises which places

on the beneficiary the burden of proving beyond a reasonable doubt that the grantor enjoyed both

the required mental capacity and freedom of will.  *Noland v. Noland*, 330 Ark. 660, 664, 956

S.W.2d 173, 175 (1997).  Similarly, where a confidential relationship exists between a grantor

and a dominant grantee, a presumption of undue influence and coercion may be triggered,

shifting the burden to the grantee to rebut the presumption.  *Myrick v. Myrick*, 339 Ark. 1, 7-8, 2

S.W.3d 60, 64-65 (1999).  Although most often applied to wills, these rules also apply to a power

of attorney.  *Wolfe v. Estate of Wolfe*, 1987 WL 9787 (Ark.App. 1987).[9]

There is no question that Ellen procured the power of attorney and ownership of the

Policy and that she enjoyed a confidential relationship with Niki.  *Cf. Stanley v. Burchett*, 93

Ark.App. 54, 59, 216 S.W.3d 615, 619 (2005) (procurement found where the beneficiary held the

decedent's power of attorney and directed the will to be written) (citing *Orr v. Love*, 225 Ark.

505, 283 S.W.2d 667 (1955); *In re Estate of Garrett*, 81 Ark.App. 212, 100 S.W.3d 72 (2003));

*Dent v. Wright*, 322 Ark. 256, 261, 909 S.W.2d 302, 304 (1995) (a person who holds power of

attorney is an agent, and it has long been recognized that a fiduciary relationship exists between

---

[9] In its letter notifying Ellen that the current beneficiary of record on the Policy was not valid under Arkansas law, and in its complaint commencing this interpleader action, Conseco invoked the Uniform Statutory Form Power of Attorney Act, specifically Ark. Code Ann. § 28-68-410.  The Court determines that the Uniform Act is not particularly applicable in these circumstances, however.  The Uniform Law Comment to § 28-68-401 provides that the form set forth in Section 1 of the statute "is sufficient and necessary to bring the Act into operation.  A form used to create a power of attorney subject to the Act should use the language provided in Section 1.  Minor variances in wording will not take it out of the scope of the Act."  Here, the wording of the power of attorney executed by Ellen does not substantially comply with the statutory power of attorney set out in Ark. Code Ann. § 28-68-401.  *See Vogelgesang v. U.S. Bank, N.A.*, 92 Ark.App. 116, 119, 211 S.W.3d 575, 577-78 (2005).  The Court notes that the Uniform Law Comment to § 28-68-401provides that "[n]either Section 1, nor the Act as a whole, attempt to provide an exclusive method for creating a power of attorney," and that "[o]ther forms may be sued and other law employed to create powers of attorney."

principal and agent in respect to matters within the scope of the agency).[10]  Accordingly, the issue

to be addressed is whether Ellen has proved beyond a reasonable doubt that the procurement of

the power of attorney and ownership of the Policy was not the product of insufficient mental

capacity on the part of Niki or undue influence.[11]

The question of mental capacity and undue influence are so closely interwoven that they

are sometimes considered together.  *Matter of Conservatorship of Kueteman*, 309 Ark. 546, 548,

832 S.W.2d 234, 235 (1992).  If the maker of a will or other instrument has sufficient mental

capacity to retain in his memory, without prompting, the extent and condition of his property, and

to comprehend how he is disposing of it, and to whom and upon what consideration, then he

possesses sufficient mental capacity to execute such instrument.  *Id*.  *See also Noland*, 330 Ark.

at 665, 956 S.W.2d at 176 (the rule has been generally expressed that sound mind and disposing

memory, constituting testamentary capacity, is (a) the ability on the part of the testator to retain in

memory without prompting the extent and condition of property to be disposed of; (b) to

comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those

whom he excludes from his will; testamentary capacity means that the testator must be able to

retain in his mind, without prompting, the extent and condition of his property, to comprehend to

whom he is giving it, and relations of those entitled to his bounty).  Influence by a person over

the maker of an instrument becomes undue so as to invalidate the instrument only when it is

---

[10] Ellen acknowledges she procured the power of attorney, the change of ownership of the Policy, and the change of beneficiary to herself, *see* Cross-Defendant Buckley's Br. in Supp. of Resp. to Cross-Claimants Eric Williams' and Harold Williams' Mot. for Summ. J. at 6 [doc.#88], and she acknowledges the power of attorney established a confidential relationship between herself and Niki.  *See* Def. Buckley's Br. in Supp. of Mot. for Summ. J. at 13 [doc.#84].

[11] Although whether the instrument was procured by undue influence is a question of fact for the trier of fact, *Medlock v. Mitchell*, 95 Ark.App. 132, 136, 234 S.W.3d 901, 905 (2006), the parties, as previously noted, agree that this action may be resolved on summary judgment.  *See* n.8, *supra*.

extended to such a degree as to override the discretion and destroy the free agency of the testator. *Matter of Conservatorship of Kueteman*, 309 Ark. at 548, 832 S.W.2d at 235.  It is not enough that a confidential relationship exists in order to void an instrument; there must be a malign influence resulting from fear, coercion, or any other cause which deprived the testator of his free agency in disposing of his property.  *Medlock v. Mitchell*, 95 Ark.App. 132, 137, 234 S.W.3d 901, 905 (2006).  *See also Noland*, 330 Ark. At 671, 956 S.W.2d at 179 ("The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property") (quoting *Orr*, 225 Ark. at 510, 283 S.W.2d at 670).

The Court has carefully considered the record and determines that Ellen has proved beyond a reasonable doubt that the procurement of the power of attorney and ownership of the Policy was not the product of insufficient mental capacity on the part of Niki or undue influence. Ellen testified that it was Niki's specific intent that the beneficiary of the Policy be changed from Eric and Harold to Ellen and the affidavits of Pitre, McGruder, Thorn, and Dr. Rutledge corroborate Ellen's testimony.  As previously noted, Pitre states that Niki told him "that she wanted to name Ellen Buckley as beneficiary of her life insurance policy and that under no circumstances were her sons, Eric Williams and Harold Williams, to receive any of this money." McGruder, in turn, states that after the March 2006 incident with Eric, Niki called and told him that she had made a firm decision to change her life insurance in favor of Ellen because she knew she did not have long to live.  Niki's insurance agent, Thorn, likewise states that he recalls having a conversation with Niki in April 2006 and that she requested that her beneficiary be

changed on her Policy to her sister, Ellen.  Thorn states that Niki's voice was well known to him

and that she sounded alert and intelligent.  Finally, Dr. Rutledge states that when he was at

Ellen's residence for the execution of the power of attorney, he asked Niki questions and by her

responses he determined, with a reasonable degree of medical certainty, that Niki was cognitively

and emotionally oriented as to time and place, alert as to the events surrounding her and her

situation, was fully aware of why she and he were there, was unable to control her motor skills in

her hands and arms with much skill, and that she was calm, comfortable, appeared to be well

groomed, appropriately dressed and cared for, not under any coercion, stress, fear, duress, or

mental weakness, and he did not observe any unusual behavior in Niki or any other persons

attending the execution of the power of attorney.

Eric and Harold do not specifically controvert the affidavits of Pitre, McGruder, Thorn, or

Dr. Rutledge, but argue that Ellen's account of the circumstances surrounding the procurement of

the power of attorney and change in ownership of the Policy creates reasonable doubt.  They note

as follows:

- When Niki was hospitalized in March 2006, just before Niki was discharged to Eric's home, Niki, in a psychiatric medical evaluation dated March 7, 2006, stated that she wanted to live with Eric rather than Ellen because Niki did not want to be "controlled" by her sister any longer, thus controverting the idea that the sons were long neglectful of Niki or that Ellen was always well regarded by Niki.

- In his affidavit, Eric categorically denies the claimed "triggering event" to his mother's change of intent, *i.e.*, that Eric had a fight with his mother, left her on the curb, and was purposefully and cruelly neglectful or abandoned her thereafter, and notes that on the day after Niki died, Ellen cleared out the bank accounts, telling one bank representative that the recently deceased Niki was "fine," thus indicating that Ellen was willing to utilize the power of attorney (even wrongfully) to benefit herself.

16

- Ellen claims in her deposition that it was Ellen's reluctance to accede to Niki's desire to change the named beneficiaries on the Policy that led to Niki's last hospitalization and that it was only after that hospitalization that Ellen undertook to provide this benefit to herself, but the hospital records indicate that Niki's hospitalization was May 15-17, 2006, not "around the first of May" as stated by Ellen, and May 15th was after Thorn was contacted, after Conseco sent the change in ownership form, and after the power of attorney had been executed on May 13, 2006.

- Finally, "reasonable doubt" comes from the illogical inconsistencies in Ellen's "story" explaining how the change in beneficiaries was accomplished.  What would have made sense would have been a request to Conseco for a change in beneficiary form, for Ellen at her deposition to have produced an original of the form with scribblings indicating Niki had tried but failed to sign it, for Ellen (or Niki herself) to have called Conseco to find out what to do, at that point securing an explicit power of attorney, and then using the explicit power of attorney to either change beneficiary (or perhaps) change ownership.  It is clear, however, that what was claimed to be done, in what order, and why it was done, does not hold together.  The initial step claimed by Ellen is that she requested from Conseco an initial change in ownership form, sometime prior to the execution of the power of attorney on May 13, 2006, and that this was done on the advice of Thorn but that she did not know why Thorn would recommend this.  Ellen then states that Niki tried to sign the form and couldn't, ruining the form requiring that a new form be re-sent by Conseco.  Yet the document purporting to be the "ruined" signature is on a blank piece paper.  It is unclear from Ellen's deposition if this was on the back of the cover letter to the change of ownership or another piece of paper.  But clearly it was not on the form itself and, thus, did not ruin the form.  Therefore, Ellen's claim that the form was ruined and needed to be re-sent doesn't hold up.  The only possible explanation is that  Ellen wanted Conseco (for some reason) to have a record that Niki had ruined the first form as an excuse for utilizing a power of attorney on the second.  But again, if one was not going to use a power of attorney from the beginning, why not have Niki simply sign (or attempt to sign if you didn't know she couldn't) a change in beneficiary form in the first place.  This is never explained but that very lack of explanation creates reasonable doubt.  Finally, Ellen claims that her sister specifically confronted Dr. Rutledge, one of the witnesses to the power of attorney, to assure herself that she (Niki) could take the power of attorney "away" if Niki regained her ability to write.  But if under Ellen's "story" the only purpose of the power of attorney was to give away the policy and enable Ellen as owner to make herself beneficiary, why did it matter whether Niki could take back the

17

"power."  After all, once the policy was given away, Niki lost the ability to get it back regardless of whether or not she ever regained the ability to write her name, and whether or not she even later renounced the power of attorney.  It is evident that Niki did not know how the power of attorney was going to be used.  In any case, Ellen's "story" makes no sense.

Eric and Harold argue, based on the above, that Ellen's account of the circumstances surrounding the procurement of the power of attorney and change in ownership of the Policy are riddled with illogical, internal consistencies, but the Court finds their argument is based primarily on suspicions and theories; they have not produced anything indicating that Niki did not have sufficient mental capacity to retain in her memory, without prompting, the extent and nature of her Policy, and to comprehend how and why she was changing the beneficiary from Eric and Harold to Ellen, *see Matter of Conservatorship of Kueteman*, 309 Ark. at 548, 832 S.W.2d at 235 (mental capacity), and they have not produced anything indicating a malign influence resulting from fear, coercion, or any other cause which deprived Niki of her free agency in changing the beneficiary under the Policy.  *Id*. (undue influence).  Even transfers of property between a grantor and her fiduciary are not set aside on the basis of undue influence when there has been no proof the grantee/fiduciary said or did anything to put the grantor in a position of fear or to defraud her.  *See Dent,* 322 Ark. at 261, 909 S.W.2d at 304.  This is true even when there is evidence to raise suspicion about impure motives.  *Id*.  322 Ark. at 261, 909 S.W.2d at 305.  Nor does the mere  presence of the grantee when a deed is made give rise to a presumption of undue influence.  *See In re Conservatorship of Kueteman,* 309 Ark. at 550, 832 S.W.2d at 236.  While undue influence may be inferred from undisputed facts and the reasonable inferences to be deduced therefrom, *Orr,* 225 Ark. at 512, 283 S.W.2d at 671, something more than "suspicions and theories" must be shown.  *See Matter of Estate of Davidson,* 310 Ark. 639, 646,

18

839 S.W.2d 214, 218 (1992).  Allegations of undue influence must be supported by proof.  *Id.*

Here, there simply is nothing in the record suggesting insufficient mental capacity on the part of

Niki and there has been no proof that Ellen said or did anything to put Niki in a position of fear

or to defraud her.  Even discounting Ellen's testimony that Niki was upset with Eric and Harold

and wanted to change the beneficiary on the Policy to Ellen and that it was Thorn that suggested

Ellen request a change of ownership form and, upon receiving that, a change of beneficiary form,

the record otherwise establishes beyond a reasonable doubt that Niki wanted to name Ellen the

beneficiary under the Policy and that the procurement of the power of attorney was not the

product of insufficient mental capacity on the part of Niki or undue influence.

Eric and Harold argue, however, that the power of attorney does not in any way indicate

that Niki intended Ellen to give herself the Policy or change the beneficiary and they urge this

Court to follow those states that have adopted a flat prohibition on using oral statements of intent

to supplement a power of attorney that includes no language on gifting (much less self-gifting) by

the holder of the power.  *See e.g., Fender v. Fender,* 285 S.C. 260, 261, 329 S.E.2d 430, 431

(1985) ("in order to avoid fraud and abuse, we adopt a rule bartering a gift by an attorney in fact

to himself or a third party absent clear intent to the contrary evidenced in writing").  Certainly,

Ellen's changing the ownership and ultimate beneficiary of the Policy to herself by way of the

power of attorney was self-dealing, and the guiding principle of the fiduciary relationship is that

self-dealing, absent the consent of the other party to the relationship, is strictly proscribed.  *Cole*

*v. Laws*, 349 Ark. 177, 185, 76 S.W.3d 878, 883 (2002).  But consensual self-dealing is

permissible, *see id.*, and an insured's hearsay statements to several people concerning that

insured's intention as to beneficiaries or changes in beneficiaries in insurance contracts are

admissible to resolve disputes as to the proper beneficiary.  *Primerica Life Ins. Co. v. Watson*, 362 Ark. 54, 60-61, 207 S.W.3d 443, 447-48 (2004).  This Court declines to adopt a rule at odds with Arkansas law.

III.

For the foregoing reasons the Court denies the motion for summary judgment of Eric Williams and Harold Williams [doc.#76] and grants the motion for summary judgment of Ellen Buckley [doc.#83].  Judgment will be entered accordingly.

IT IS SO ORDERED this 17th day of July, 2009.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE